Filed 7/17/24  P. v. Vega CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHRISTIAN VEGA,<br><br>Defendant and Appellant. | B323990<br><br>(Los Angeles County<br>Super. Ct. No. BA314454) |

APPEAL from an order of the Superior Court of Los Angeles County, Michael E. Pastor, Judge.  Reversed and remanded.

Kathy Moreno, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, David E. Madeo and David A. Voet, Deputy Attorneys General for Plaintiff and Respondent.

In 2009, the jury found Christian Vega guilty of first degree murder (Pen. Code,[1] § 187, subd. (a) [count 1]), second degree commercial burglary (§ 459), attempted second degree robbery (§§ 664/211), and forgery (§ 476). The jury found true the special circumstance allegation that Vega committed the murder while engaged in the commission of burglary (§ 460) and robbery or attempted robbery (§§ 211, 212.5). (§ 190.2, subd. (a)(17).) The jury also found true a gang enhancement (§ 186.22, subd. (b)(1)(A)) and a firearm enhancement for use by a principal (§ 12022.53, subds. (d) & (e)(1)). Vega was sentenced to life without the possibility of parole.

Oscar Olloqui, Steven Cuellar, and Erick Bautista were also charged and convicted of the offenses. Vega and Cueller were tried jointly by separate juries. Olloqui and Bautista were also tried jointly by separate juries.

After the enactment of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015), Vega filed a petition for vacatur of his murder conviction and resentencing pursuant to former section 1170.95 (now § 1172.6). The trial court denied the petition at the prima facie stage, finding that Vega was ineligible for relief as a matter of law because the jury found true the special circumstance allegation that Vega committed the murder while engaged in the commission of burglary and robbery or attempted robbery (§ 190.2, subd. (a)(17)).

Vega appealed. Another panel of this court reversed and remanded, holding that the special circumstance finding did not preclude Vega from eligibility for resentencing under section 1172.6.

---

[1] All further statutory references are to the Penal Code.

On remand, following an evidentiary hearing held pursuant to section 1172.6, subdivision (d)(3), the trial court again denied the petition. The trial court found, beyond a reasonable doubt, that Vega was guilty of first degree felony murder as a major participant who acted with reckless indifference to human life, and alternatively, that Vega was guilty as a direct aider and abettor of second degree implied malice murder.

In his present appeal of the trial court's order, Vega contends that the evidence was insufficient for the court to find that he could be convicted of felony murder, and that the trial court applied an incorrect standard when determining whether he could be convicted under an implied malice direct aiding and abetting theory.

We agree with Vega. The evidence is insufficient to support a finding that Vega acted with reckless indifference to human life.[2] Additionally, it appears that the trial court applied the wrong standard when determining whether Vega could still be convicted under an implied malice direct aiding and abetting theory. Because we cannot know whether the trial court would have reached the same result under the correct standard, we reverse and remand for the trial court to conduct further proceedings consistent with this opinion.

---

[2] Because we conclude that the evidence is insufficient to support a finding that Vega acted with reckless indifference to human life, we do not reach the issue of whether he was a major participant in the underlying robbery.

# FACTS AND PROCEDURAL HISTORY

## *The People's Return to the Second Order to Show Cause*

In the return to the second order to show cause following this court's remand, the People argued that the record of conviction proved that Vega was guilty of murder beyond a reasonable doubt under a theory of felony murder, as a major participant who acted with reckless indifference to life, and also as a direct aider and abettor of implied malice murder.

## *Evidence from the Record of Conviction*

### The Offenses

In early November 2006, brothers Sam and Simon Khalil owned and operated the Maple Market and Liquor Store (Maple Market) in Los Angeles.[3]  The store sold various items and cashed checks.  The Maple Market required people to provide identification when cashing checks, unless the check came from a known company, such as the Print Shop, which was located about one-half mile away.

Around October 18 or 19, 2006, the Print Shop was burglarized, and blank checks were stolen.  Olloqui obtained some of the blank Print Shop checks.

---

[3] Because they share the same last name, we refer to Sam and Simon Khalil by their first names throughout the opinion. No disrespect is intended.

On October 20 and 21, 2006, the Maple Market cashed several Print Shop checks that it deposited into the market's bank account. Around October 30 or 31, the bank informed Sam that it would not honor the checks that the Maple Market had cashed. The market lost the money it had paid out.

On November 2, 2006, around 1:00 p.m., Nathaniel Barnes was in the area of the Maple Market when he saw two men "fidget[ing]" with a backpack. One of the men put a large object inside it. The other man stood next to his companion, looking up and down the street. Barnes saw the butt end of a shotgun being placed in the backpack. The man carrying the backpack encouraged the other man to go into the market.

As Barnes walked down Maple Avenue toward 31st Street, he noticed a blue SUV. Barnes stopped about 12 feet from the SUV. Two Hispanic men were sitting in the driver and front passenger seats. Barnes later identified Olloqui as the driver. Barnes had been looking at the men for about five to seven seconds when the passenger said, "Just keep walking. I'll take care of you." Barnes continued walking down 31st Street and stopped to smoke a cigarette. When Barnes began walking again, the blue SUV drove past him as if it were being chased.

Sam and Simon were working at the Maple Market that day. Sam walked to the restaurant next door to pay a bill. From the restaurant, Sam heard two men tell Simon, "Give us the money." Sam snuck outside to see what was happening and saw two Hispanic men—one of whom he identified as Cuellar at trial—with a gun and a rifle. Sam had gone back inside the restaurant and was calling 911 when he heard a gunshot. While speaking with the 911 operator, Sam returned to the market and saw Simon lying on the floor. Sam saw the men run down Maple

Avenue and turn onto 31st Street. Paramedics arrived and took Simon to the hospital where he received treatment, but ultimately died from the gunshot wound.

Oscar Rodriguez entered the Maple Market around 1:00 p.m. that day and noticed two men facing the cashier. Rodriguez walked to the back of the store. He heard a gunshot and looked up at an overhead mirror to see what happened. Rodriguez saw two men running away.

At the same time, Karla Medina was in her car when she heard a gunshot come from the Maple Market. Two men casually walked out of the market. There was a scream, and the men began to run down Maple Avenue towards 31st Street. At trial, Medina identified Cuellar as one of the men. The other man placed an object in his backpack that Medina believed was a weapon. The men got into the back seat of a dark blue car, which sped away. Medina called 911 and reported a shooting.

### The Investigation

About 1:10 p.m., on November 2, 2006, Los Angeles Police Department Detectives Sunny Romero and Richard Arciniega arrived at the Maple Market. The officers collected an expended bullet inside the check cashing booth. Video from the market's front door surveillance camera showed, at 1:05 p.m., a man wearing a white shirt and a man wearing a dark-colored jacket. The video depicted Simon arguing with the men. Sam provided Detective Romero with surveillance video "stills" of some of the customers he believed had cashed some of the bad checks, copies of the bad checks, and contact information for the Print Shop's owners. Using the videotape stills, the detectives met with gang

officers to see if they could identify the individuals who had cashed the bad checks. The detectives created a number of six-pack photographic lineups.

On December 20, 2006, Cuellar was detained outside his residence on 51st Street. Detective Romero searched Cuellar's bedroom and found a California identification card in Cuellar's name, a sawed-off shotgun, shotgun rounds, a .380-caliber semiautomatic handgun and magazine, a black back brace, and a baseball cap that appeared to be similar to a cap worn by a person depicted in a surveillance videotape cashing a forged Print Shop check.

**Forensic Evidence**

Diana Paul, a Los Angeles Police Department criminalist, analyzed a fired bullet and a fired cartridge case recovered at the Maple Market to determine if they were fired from the .380-caliber semiautomatic handgun and magazine found in Cuellar's bedroom. Although Paul determined that it was possible that the handgun fired the bullet and cartridge, the results of her analysis were inconclusive, meaning that she could not say to a scientific certainty that the bullet was or was not fired from the handgun.

**Vega's Interview Statements**

On December 19, 2006, Detectives Romero and Arciniega conducted a recorded interview of Vega.

Vega told the detectives that on the week of the murder, Olloqui told Vega the "piasas" were looking for someone to pass stolen checks. Vega went to the market with Olloqui twice prior

7

to the day of the murder.  Vega never went inside the market to cash checks; he waited outside while Olloqui went in.

On the morning of the murder, Olloqui called Vega about cashing the last check.  Vega thought that Olloqui believed they might get caught but that Olloqui wanted to take the chance.  Vega told the detectives, "All I know—he was calling me, and he was like (Inaudible) dangerous (Inaudible) you know, the fool was to find somebody to cash his check.  I don't know he's (Inaudible) I ain't doing it, you know what I mean?"  "I ain't trying to (Inaudible) nothing.  Especially if you guys have been doing this for a while.  [Olloqui's] all go back to there.  Let's see . . . ."

Later that day, Olloqui picked up Vega "in [Cuellar's] right there[.]"  Cuellar had cashed a check at the market once already.  They saw Cuellar in the neighborhood as they were driving.  They said "[W]hat's up homie?  Do you need some cash[?]"  Bautista already had a shotgun with him in his backpack when they picked him up.  Cuellar had a ".380[.]"  Olloqui told Cuellar and Bautista "what they were going to do[.]"

It was Cuellar's idea to rob the market if the cashier did not cash the check.  "[N]ever once did they—anybody say that we're going to smoke this fool . . . ."

A person walked up while Vega and Olloqui were sitting in the vehicle and Vega told him to go away.

Cuellar and Bautista were in the store for less than five minutes.  Vega did not hear a gun shot.  Cuellar or Bautista ran to the vehicle yelling " 'Go!  Go!  Go!' "  One of them said " 'I shot him!  I shot him with (Inaudible) I shot him!'  And [Vega] was like Damn, what the fuck?"

Olloqui dropped Vega, Cuellar, and Bautista off in the projects.  Cuellar and Bautista kept their guns and the check.

## Cuellar's Interview Statements

On December 20, 2006, Detectives Romero and Arciniega interviewed Cueller regarding the shooting.

Cuellar stated that he and Bautista had to commit the robbery because they owed Olloqui money. Olloqui and Vega had lent Cuellar money and given him drugs "a while back." When Olloqui picked Cuellar up, Vega was already in the car. The three of them went to pick up Bautista.

Olloqui told Cuellar that the check would pay back all the money Cuellar owed him. The plan was to rob the market. They did not need to talk about the plan after they picked Bautista up, because Olloqui told Bautista what he needed to do beforehand. Olloqui gave Cuellar a gun. It was black, but Cueller did not know what kind it was.

Olloqui told Cuellar to go into the Maple Market and rob "everything." Olloqui had already made "them" cash "all those checks" that had been stolen. Cuellar and Bautista went in. Bautista had a gun in his backpack that looked like a shotgun.

Cuellar gave a check to the cashier. The man started yelling and walked around to the front of the counter. Cuellar said something like " 'Just give me all [the] money.' " Then Cuellar shot the man because Olloqui told Bautista that "he" had to shoot him. Cuellar did not know if he killed the man or not.

Cuellar went to the Maple Market to cash a check with Olloqui one other time. Cuellar gave Olloqui the money and Olloqui gave him some of the money back.

*Section 1170.95 Evidentiary Hearing*

<u>Argument</u>[4]

At the evidentiary hearing held pursuant to section 1172.6, defense counsel argued that Vega was not a major participant in the underlying robbery. Olloqui was the mastermind. Vega did not supply weapons to anyone or instruct them on what to do.

With respect to reckless indifference to human life, counsel argued Vega had no knowledge that the robbers had a propensity for violence, Vega was not at the scene of the shooting, and he was not the driver of the getaway vehicle. Vega did not witness the shooting, and it was not clear whether he heard the shot. Vega was not armed at any time.

Returning to major participation, counsel argued that Olloqui supplied the gun. The record fell short of showing what Vega personally did or thought. Regarding Vega's interaction with Barnes, counsel argued that it was not clear that Barnes

---

[4] At the hearing, defense counsel argued that gang evidence was no longer admissible to establish that a person committed a crime to gain a reputational benefit, and could not be admitted to impute motive or mental state relating to reputational benefit. The prosecutor responded, "I understand what counsel was saying about the gang evidence. I'm not going to litigate that at this point." Nonetheless, the prosecutor made several arguments based on gang evidence that the respondent's brief relies upon as well. The trial court appears to have accepted the prosecutor's representation that he was not going to argue for admission of the gang evidence, as the court's ruling makes no reference to the gang evidence. We do the same on appeal, omitting the gang evidence and arguments related thereto.

was a witness. Barnes was walking away from Maple Market and got close to the getaway vehicle. Vega simply shooed him off.

Vega was not in a position to prevent the murder because he was not present at the scene of the crime. Vega could not return to the market to assist Simon because Vega was not driving. Vega did not assist in disposing of the guns.

Finally, counsel argued that Vega knew that the juveniles would rob Maple Market if the check was not cashed, but there was no evidence that he knew someone would be killed. The risk was no greater than that ordinarily associated with an armed robbery.

The prosecutor responded that, even at the time of trial, the jury had to find that Vega "acted with a great risk to life." Vega knew there would be a robbery if the check was not cashed. He was already in the car when the robbers were picked up, and he knew that Cuellar had a .380 firearm and Bautista had a sawed-off shotgun. Vega had said it was too dangerous, and he did not want to go into the market himself.

The individuals all knew each other. Vega knew what was going on. The juveniles left the vehicle with the weapons. When Barnes was watching them, and Vega warned him to "keep moving or I'll take care of you." Vega made sure that there were no witnesses near the scene who could identify them. Vega was present after Cuellar said he shot someone, but Vega did not prevent anyone from committing the crime and he did not abandon the criminal enterprise after learning of the shooting. Vega fled with the other perpetrators. He did not report the crime or go back to offer assistance.

Regarding implied malice, Vega sent two juveniles to commit an armed robbery with a sawed-off shotgun and a gun

11

although it was such a dangerous situation that he would not personally have gone into the market.

Defense counsel responded that "dangerous" in the context of Vega's interviews with detectives referred to the odds of getting caught. There had been no previous violent interaction with the market owners, and there was no evidence that Vega had experience with the juveniles that would alert him to the possibility that the robbery would become violent.

The prosecutor replied that this venture into the market was more dangerous than the prior ones. Previously one person went into the market unarmed, but on this occasion two people were going in armed. "Danger" meant the danger of violence, not just the danger of being caught. Vega was aware that Bautista had a propensity for violence because Bautista already had a sawed-off shotgun in his backpack. Vega scared away a potential witness knowing that Cuellar intended to commit a robbery if necessary.

### Trial Court's Ruling

The trial court first addressed whether Vega could be convicted under a felony murder theory, which would require a finding that he was a major participant in the robbery who acted with reckless indifference to human life. The court found that Vega was "directly significantly involved in the planning of this underlying scheme" as evidenced by the fact that he had been involved in passing the bad checks before the day of the murder. This time, the danger would be "ratchet[ed] up dramatically" because it was the last time they could attempt to pass a check. Vega believed that it was so dangerous that he was not willing to

12

go into the market.  Vega's reference to danger could be interpreted in different ways, but the market's discovery of the past nonviolent check-cashing scheme created a grave risk of death.  There was no longer one person going in unarmed, but two people going in armed—"two juveniles who were recruited and picked up by [Olloqui] and [Vega]."  Vega knew the juveniles were armed and knew what kind of guns they carried.  The sawed-off shotgun was a particularly sinister weapon.  Vega and Olloqui directly ordered the juveniles into the market.  This was an enhanced robbery.  It was planned, not unanticipated.  Everyday members of the public would be going in and out of the market—anyone could be inside.  Vega was "located very close outside, close enough to be available, readily available, to continue with the robbery endeavor."  He was not a getaway driver or a "mere lookout."  Vega threatened Barnes and decreased the chances that he would interfere.

Cuellar told everyone that he shot someone, but Vega did not intervene.  He made no effort to "ratchet down the situation."  Vega did not prevent one or both of the juveniles from entering the market.  The risk was greater than it had been due to changed circumstances, the involvement of others, and the fact that two minors were sent in.  Vega was involved in the planning.  He was "involved in the presence of lethal weapons and aware of them."

After the fact, when Vega knew someone had been shot, he did not leave, get out of the vehicle, or run away.  He did not direct Olloqui to drive away without the juveniles.  He did not attempt to help Simon.  Vega continued with his cohorts until they reached a place of safety.  The People met their burden to

establish that Vega could be convicted of felony murder beyond a reasonable doubt.

The People also met the requirements for demonstrating implied malice direct aiding and abetting murder. Vega understood the dangerous consequences of his actions to human life, but did not care about those consequences.

## DISCUSSION

On appeal, Vega contends that there was insufficient evidence that he could be convicted of felony murder, and that the trial court did not apply the correct standard when it concluded that he could be convicted as an aider and abettor of implied malice murder. We agree and reverse the trial court's order.

### *Section 1172.6*

Effective January 1, 2019, the Legislature amended sections 188 and 189 "as to the 'felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Sen. Bill No. 1437 (2017–2018 Reg. Sess.); Stats. 2018, ch. 1015, § 1, subd. (f).) As amended, the law defining malice provides that except for first degree felony murder, 'in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her

14

participation in a crime.' (§ 188, subd. (a)(3); *People v. Eynon* [(2021)] 68 Cal.App.5th [967,] 974.) By this change, the Legislature intended that '[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea.' (Stats. 2018, ch. 1015, § 1, subd. (g).)" (*People v. Basler* (2022) 80 Cal.App.5th 46, 54, fn. omitted.)

As relevant here, pursuant to section 1172.6, subdivision (a)(1) to (3), a defendant must file a petition in the sentencing court averring that: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder . . . [;] [¶] (2) The petitioner was convicted of murder . . . following a trial . . . [;] [¶] [and] (3) The petitioner could not presently be convicted of murder . . . because of changes to Section 188 or 189 made effective January 1, 2019." (See *id.*, subd. (b)(1)(A).)

If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the trial court must issue an order to show cause. If an order to show cause issues, the court then "hold[s] a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts," unless the parties "waive a resentencing hearing and stipulate that the petitioner is eligible to have [his or her] . . . conviction vacated and to be resentenced." (§ 1172.6, subd. (d)(1)–(2).) "At the hearing . . . the burden of proof . . . [is] on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder . . . ." (§ 1172.6, subd. (d)(3).)

On appeal from a trial court's order denying a section 1172.6 petition following a subdivision (d)(3) hearing, this court evaluates the sufficiency of the evidence for the court's

15

determination using the substantial evidence standard of review. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 747.) " '[W]e look to whether the prosecution has introduced sufficient evidence of " ' "reasonable, credible, and of solid value to support a finding beyond a reasonable doubt" ' " ' that petitioner was guilty. ([*People v.*] *Clark* [(2016)] 63 Cal.4th [522,] 618 [(*Clark*)].)" (*People v. Henley* (2022) 85 Cal.App.5th 1003, 1017 (*Henley*).) Questions of law are reviewed de novo. (*People v. Lewis* (2021) 11 Cal.5th 952, 961.)

### *Felony Murder*

"Under the amended felony-murder rule, a defendant who was not the actual killer and did not act with the intent to kill can only be liable for murder if []he was a major participant in the underlying felony and acted with reckless indifference to human life. [Citations.] '[T]he standard under section 189, subdivision (e)(3) for holding . . . a defendant liable for felony murder is the same as the standard for finding a special circumstance under section 190.2(d), as the former provision expressly incorporates the latter.' [Citation.] Accordingly, death penalty cases interpreting section 190.2, subdivision (d), including *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), are controlling . . . ." (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 123.)

Here, we conclude the evidence is insufficient to support the finding that Vega acted with reckless indifference to human life. We therefore reverse on that ground without deciding the question of whether Vega was a major participant in the robbery.

16

(See *People v. Keel* (2022) 84 Cal.App.5th 546, 557, fn. 2 [unnecessary to consider whether petitioner was a major participant where there is insufficient evidence of reckless indifference].)

"To determine whether a defendant acted with reckless indifference to human life, we 'look to whether a defendant has " 'knowingly engag[ed] in criminal activities known to carry a grave risk of death.' " [Citations.]' (*Banks*, *supra*, 61 Cal.4th at p. 801.) 'The defendant must be aware of and willingly involved in the violent manner in which a particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create.' (*Ibid*.)" (*Henley*, *supra*, 85 Cal.App.5th at p. 1015.)

"In *Clark*, *supra*, 63 Cal.4th at pages 618 through 622, the California Supreme Court established a five-factor test for whether a defendant acted with reckless indifference to human life . . . . [N]o one factor is necessary, nor is any necessarily sufficient. The first factor is the defendant's knowledge of weapons, and use and number of weapons. (*Id*. at p. 618.) 'The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life.' (*Ibid*.) However, it may be 'significant' if a defendant personally uses a weapon during the crime. (*Ibid*.) The second factor is whether the defendant was physically present at the crime scene and whether he or she had opportunities to limit the crime or aid the victim(s). (*Id*. at p. 619.) A defendant's presence may be particularly significant where 'the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to

17

suggest a willingness to use lethal force.' (*Ibid*.)  The third factor is the duration of the felony; crimes of longer duration present greater risk of violence and therefore evince more reckless indifference.  (*Id*. at p. 620.)  'Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, "there is a greater window of opportunity for violence" [citation], possibly culminating in murder.'  (*Ibid*.)  The fourth factor is the defendant's knowledge of his or her coparticipants' likelihood of killing.  (*Id*. at p. 621.)  A defendant who knows a coparticipant previously has used lethal force is more culpable than one unaware of a coparticipant's propensity for violence.  (*Ibid*.)  The fifth factor is whether the defendant made any efforts to minimize the risk of violence.  (*Ibid*.)  Such efforts may include planning the crime to occur at a time or location where bystanders are unlikely to be present, or using unloaded or minimally loaded firearms.  (See *id*. at pp. 621–622.)"  (*Henley*, *supra*, 85 Cal.App.5th at pp. 1015–1016.)

"Both the 'magnitude of the objective risk of lethal violence and a defendant's subjective awareness of that risk' are relevant to the reckless indifference inquiry.  (*Clark*, *supra*, 63 Cal.4th at p. 623.)  'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to demonstrate reckless indifference to human life.  Instead, 'knowingly creating a "grave risk of death" ' is necessary to establish the requisite mindset.  (*Banks*, *supra*, 61 Cal.4th at p. 808.)  ' "[T]he fact a participant [or planner of] an armed robbery could anticipate lethal force might be used" is not sufficient to establish reckless indifference to human life.'  (*In re Scoggins* (2020) 9 Cal.5th 667, 677, quoting *Banks*, at p. 808.)  'The defendant must be aware of

and willingly involved in the violent manner in which the particular offense is committed,' and must then consciously disregard 'the significant risk of death his or her actions create.' (*Banks*, at p. 801.)"  (*Henley*, *supra*, 85 Cal.App.5th at p. 1016.)

### **Knowledge of Weapons**

With respect to the first factor, Vega knew that two firearms would be used prior to commission of the crimes. However, there is no evidence regarding whether Vega was aware at the time of the robbery of the types of weapons used, or whether either weapon was loaded.  Although the record supports the finding that Vega knew this information when the police interviewed him over a month after the murder, that later knowledge is not of significance.

Vega did not supply the juveniles with the firearms. Olloqui supplied Cuellar with the handgun; Bautista had the shotgun with him in his backpack when Olloqui and the others picked him up.  There was no evidence that Vega helped Olloqui or Bautista procure the weapons or knew that weapons would be used before Olloqui gave the handgun to Cuellar in the vehicle. Vega himself was not armed at any point during the robbery.

While the trial court's findings with respect to the firearms weigh against Vega, alone they are not sufficient to demonstrate reckless indifference.  (*Clark*, *supra*, 63 Cal.4th at p. 618.)  When considered in context of the wide spectrum of knowledge and involvement with deadly weapons, Vega's knowledge places him much closer to the defendant who has no knowledge of the weapons involved than to the defendant who supplies those weapons, loads them, or wields them himself.

19

## Presence

The second factor weighs in Vega's favor. Vega was not present at the scene of the robbery. He was a passenger in the getaway vehicle, which was parked a block away. Vega did not leave the vehicle at any time to assist Cuellar and Bautista in the robbery, and the evidence suggests he did not intend to. Vega told the detectives that Olloqui was looking for someone to cash his checks and "I ain't doing it, you know what I mean?"

The shooting occurred within minutes of Cuellar and Bautista entering Maple Market—it was not "a culmination or a foreseeable result of several intermediate steps" during which Vega would have had an opportunity to restrain the crime or assist the victims. (*Clark*, *supra*, 63 Cal.4th at p. 619.) The plan was for the juveniles to enter the market, attempt to cash the check, and rob the cashier if he refused to cash it.

There is no evidence that Vega heard the gunshot that killed Simon or had any idea that the robbery had gone awry before Cuellar jumped into the vehicle, yelling that he shot someone and telling Olloqui to go immediately. According to Barnes's testimony, Vega was a passenger in a vehicle that was speeding away from the scene as if it was being chased. Vega had little, if any, opportunity to assist the victim of the shooting or to extract himself from the situation.

Finally, there is no evidence that Cuellar, who shot and killed Simon, exhibited behavior prior to the murder that suggested he would use lethal force. Cuellar said he would rob the market if the cashier did not comply. There is no evidence suggesting that he would shoot the cashier.

### Duration

The crime took place over a span of five minutes or less. The duration does not favor a finding that Vega acted with reckless indifference.

### Knowledge of Coparticipant's Propensity for Violence

There was no evidence that Cuellar or Bautista had a propensity for violence or had previously used lethal force, let alone that Vega was aware of such a propensity.

### Efforts to Minimize Risk

This factor does not weigh in Vega's favor. Daylight and the presence of people increased the risk involved in the robbery. Vega had been to the market previously, so it is logical to infer that he knew there would likely be customers inside the store. Vega was also aware that Cuellar and Bautista were armed, and he presumably knew that they were younger than he and Olloqui were and less predictable due to their youth. Vega's presence in the getaway vehicle evidenced approval, or at least acceptance of these conditions. There was no evidence presented that Vega attempted to persuade his compatriots to commit the robbery under less dangerous circumstances.

## Conclusion

Balancing the *Clark* factors against one another we cannot conclude that substantial evidence supports the trial court's finding that Vega acted with reckless indifference to human life. Vega's personal actions were insufficient to sustain such a finding. The evidence shows that Vega was aware of the check-cashing venture and had gone with Olloqui on two previous occasions when Olloqui passed bad checks. He rode along with Olloqui on the day of the murder, and by his own admission he encouraged Cuellar to join them by asking Cuellar if he wanted to make some money. Vega did not abandon the enterprise when he learned that the juveniles intended to rob the market if they were unable to cash the check and that they were going in armed. When Barnes walked toward the getaway vehicle from the direction of the market, Vega warned him to keep moving or Vega would "take care" of him.

However, Vega did not "knowingly creat[e] a 'grave risk of death.'" (*Banks*, *supra*, 61 Cal.4th at p. 808.) Vega agreed to ride along on the check-cashing venture, as he had done in the past. Vega did not procure, provide, or at any time possess a firearm, enter the Maple Market or go within a block of it, threaten or harm Simon, or drive the getaway vehicle that facilitated the shooter's escape.[5] It was not Vega's idea to rob the market, and he did not know that Simon had been shot until the

---

[5] The respondent's brief inaccurately states that Vega "drove [Cuellar, Bautista, and Olloqui] away" from the scene rather than assisting the victim. It was undisputed that Vega was a passenger in the vehicle and not the driver.

vehicle was speeding away. He did not have an opportunity to restrain Cuellar inside the market or to aid Simon when he learned what happened. There is substantial evidence that Vega had the knowledge that death was a risk, as it is in every armed robbery, but that knowledge is insufficient to sustain a finding that Vega acted with reckless indifference to human life. (*In re Scoggins*, *supra*, 9 Cal.5th at p. 677; *Banks*, at p. 808.) There was no evidence that Vega possessed "a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if [Vega did] not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.) The trial court's finding that Vega could still be found guilty of felony murder is not supported by substantial evidence.

### *Direct Aider and Abettor of Implied Malice Murder*

Vega contends that the trial court applied an incorrect standard to determine whether he could be convicted as a direct aider and abettor of implied malice murder. He asserts that reversal and remand are required under *People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).[6] We agree.

---

[6] Vega alternatively argues that there is insufficient evidence to support a finding that he could still be convicted as a direct aider and abettor of implied malice murder. Because we reverse and remand on the basis that the trial court applied the wrong standard, we do not address the alternative argument.

### People v. Reyes

In *Reyes*, the defendant accompanied fellow gang members on bicycles as they chased a car. (*Reyes*, *supra*, 14 Cal.5th at p. 985.) One of the gang members had a gun, which he used to shoot the driver in the head, killing him. (*Ibid.*) The shooter had shown the gun to the defendant before the chase ensued (*ibid.*), but there was no evidence that the defendant expressly agreed to act as back-up to the shooter when the shooter committed the murder (*id.* at p. 986). Later that day, the defendant used the murder weapon in an assault. (*Id.* at p. 985.) At one point he held the gun to the back of the assault victim's head. (*Ibid.*) The assault victim wrestled the gun away and the defendant and the other gang members fled. (*Ibid.*)

The Supreme Court held the trial court's ruling that the defendant was guilty of murder as a direct aider and abettor of second degree implied malice murder was based upon an error of law. (*Reyes*, *supra*, 14 Cal.5th at p. 990.) The court explained: " '[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. ([*People v. McCoy* (2001) 25 Cal.4th 1111, 1122.]) In the context of implied malice, the actus reus required of the perpetrator is the commission of a life endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and

abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' ([*People v.* ]Powell [(2021)] 63 Cal.App.5th [689,] 712–713, fn. omitted; see *id.* at p. 713, fn. 27 ['The relevant act is the act that proximately causes death.'], citing *People v. Cravens* [(2012)] 53 Cal.4th [500,] 507 and ([*People v.*] *Knoller* [(2007)] 41 Cal.4th [139,] 143.)" (*Id.* at pp. 990–991.) The *Reyes* court concluded that the trial court had failed to recognize that implied malice aiding and abetting requires "proof of the aider and abettor's knowledge and intent with regard to the *direct perpetrator's* life endangering act." (*Id.* at p. 991.) There, the life-endangering act was the shooting, so the trial court "should have asked whether Reyes knew that Lopez intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Id.* at p. 992.)

Because it was unclear whether the trial court would reach the same conclusion under the correct standard, the Supreme Court reversed the Court of Appeal with directions to remand the matter to the trial court for further proceedings. (*Reyes*, *supra*, 14 Cal.5th at p. 992.)

### Analysis

We review independently the legal question of whether the trial court applied the correct standard for implied malice direct aiding and abetting. (*Reyes*, *supra*, 14 Cal.5th at p. 988.)

In Vega's case, the trial court's ruling was brief:

"With regard to second degree implied malice murder, the court does conclude as well that the People have met their burden of demonstrating the requisite actions of Mr. Vega and his subjective awareness of the very real, dangerous consequences to human life.

"Mr. Vega has consciously and deliberately performed those overall actions at the stages I indicated [in the court's ruling on felony murder] with the requisite knowledge of the danger to and conscious disregard for human life. Mr. Vega did not care. He did not care whatsoever for purposes of first degree felony murder, and he did not care whatsoever before, during or after the fact of the concept of second degree implied malice murder."

As in *Reyes*, here the court did not consider the perpetrator's life-endangering act—the shooting that proximately caused Simon's death. Rather, the court appears to have conflated the felony murder and direct aiding and abetting implied malice murder analyses and looked only at Vega's personal mental state and actions without considering "whether [Vega] knew that [Cuellar] intended to shoot at the victim, intended to aid [Cuellar] in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Reyes*, *supra*, 14 Cal.5th at p. 992.)

The trial court erred in sustaining Vega's murder conviction on a felony murder theory and applied an incorrect standard for implied malice aiding and abetting. Because the court did not have the opportunity to evaluate the facts under the correct standard for implied malice direct aiding and abetting, we remand the matter to the trial court for further proceedings consistent with this opinion.

## DISPOSITION

We reverse the trial court's order denying Vega's section 1172.6 petition and remand the matter to the trial court for further proceedings consistent with this opinion.

NOT TO BE PUBLISHED.

MOOR, Acting, P. J.

We concur:

KIM, J.

LEE, J.[*]

---

[*] Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.